IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 16, 2005 Session

## STATE OF TENNESSEE v. EDDIE ELVETON ROBINSON GASTON

**Direct Appeal from the Criminal Court for Knox County**
**Nos. 73803, 73804   Mary Beth Leibowitz, Judge**

---

**No. E2004-01450-CCA-R3-CD Filed January 13, 2006**

---

The Defendant, Eddie Gaston, was convicted of premeditated first degree murder, two counts of attempted first degree murder, especially aggravated kidnapping, and especially aggravated robbery. The trial court sentenced the Defendant to life in prison for the first degree murder conviction and to twenty-five years for each of the other convictions, and it ordered that all the sentences be served consecutively. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain any of his convictions; (2) the trial court erred when it ruled on several different evidentiary issues; and (3) the trial court committed sentencing errors. Finding that there exists no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Eddie Elveton Robinson Gaston.

Paul G. Summers, Attorney General and Reporter; John E. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios and Paula Ham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Facts at Trial

These cases arise from the Defendant's convictions for the murder, the attempted murder, and the kidnapping and robbery of three victims during two separate incidents. For the first incident, which involved the robbery of a Pilot gas station and the shooting of Joshua Reynolds, the Defendant was indicted by a Knox County Grand Jury, in case number 73803, for attempted first degree murder, especially aggravated kidnapping, and especially aggravated robbery. For the second

incident, the same grand jury indicted the Defendant for the premeditated first degree murder of Christopher Burton and the attempted first degree murder of Darian Sparks and Daniel Tims. The Defendant moved to consolidate these indictments for trial based on the defense theory that he intended to present. He asserted that it was necessary and imperative to his defense to have the trials together, and the trial court granted the Defendant's motion.

The following evidence was presented at the Defendant's trial on both of these indictments: James Wycoff testified that, on October 8, 2001, at 4:30 a.m., he pulled into a Pilot station to deliver biscuits, and he saw a new store clerk and what he thought was a small child, noting that the child was wearing a black hood. Wycoff attempted to enter the station, but the door was locked. Wycoff said that the clerk used a microphone that could be heard from the parking lot to tell Wycoff that there had been a chemical spill so the clerk could not let Wycoff in the station. At first, Wycoff believed the cashier, and he started to leave, but, after thinking more about it, Wycoff determined that the clerk could not be right, and he went back up to the window. There, the clerk told him to go around to the back, side door, and the clerk would let him in. Wycoff went to the door and waited for a few minutes, and then the clerk came around the corner of the store followed by a black man. The black man indicated that the clerk would be right back. Wycoff said that the clerk and the man walked across the street and around a building, and then Wycoff heard what he thought was a gunshot. Wycoff testified that, at that time, he got in his car and drove to where he had previously seen a police officer, and Wycoff and the officer returned to the Pilot station.

Wycoff said that, later that evening, he went to the Sheriff's Department to view a photographic lineup of suspects. He remembered that, at first, the police showed him black and white pictures of a "bunch" of suspects, and he picked out two pictures that looked similar to the man he saw at the Pilot station. The police then showed him eight to ten color photographs of suspects, and Wycoff positively identified the Defendant's picture as being of the man who committed this crime. Wycoff said that he also identified the Defendant in a lineup.

On cross-examination, Wycoff testified that, on the night of this incident, he never saw the clerk and the Defendant exit the station, and he saw them when he was on the side of the building where it was a "little darker." When Wycoff saw the Defendant outside the building the Defendant was no longer wearing a hood, but he was carrying a bag that had something glowing on it. Wycoff described the Defendant as having very short hair and being clean shaven on the night of this incident, and he said that he only saw him clearly for three or four seconds. Wycoff never saw a car leave the gas station, and he did not see anything sticking out of the bag. The Defendant's counsel showed Wycoff a videotape of the lineup, and Wycoff admitted that, in the lineup, the Defendant did not look clean shaven. Wycoff said that the Defendant spoke to him, and they made eye contact, and, because of this, he remembered what the Defendant looked like. Wycoff conceded that, at the preliminary hearing, he testified that the Defendant had a hood on the entire time.

Frank Carraher, a police officer for the Knoxville Police Department, testified that, in the early morning hours of October 8, 2001, he received a call about a robbery at a Pilot station on Northshore Drive. He said that, as he pulled into the Pilot's parking lot, he was met by a delivery

man, who told him that he saw a black man walk with the store clerk across the street. The officer said that he secured the crime scene and then went across the street where he found the store clerk lying in a puddle of blood. The officer got assistance from another officer, and he called an ambulance for the victim. On cross-examination, the officer conceded that it was dark where he found the victim.

Russell Whitfield, an officer with the Knoxville Police Department, testified that he was called to investigate the crime scene in this case. He said that, when he responded to this call, he saw three or four police cars at the crime scene, along with other officers. He took general crime scene photographs of the Pilot station, and then he took photographs of the scene across the street on Bearden Road, where the clerk was found, and he saw a pool of blood, a couple of shirts, a shell casing, and some eyeglasses. Officer Whitfield said that, at the Bearden crime scene, there was an office complex. The officer identified the .380 shell casing that he collected and some cash register receipts that showed that the cash register was opened at 4:19 a.m., 4:29 a.m., and 4:30 a.m. The officer testified that he retrieved the bullet that doctors recovered from the victim's head. The officer said that none of the fingerprints that he collected from the crime scene matched the Defendant. On cross-examination he stated that the VCR and videotape missing from the Pilot station had not been recovered.

Mike Jennings testified that he is the store manager for a Pilot station, and, on October 8, 2001, he determined that $366 had been stolen from his Pilot station during a robbery. On cross-examination, he said that $235 in rolled change was stolen and $131 from the cash drawer. He also said a VCR was stolen along with a security tape.

Joshua Richard Reynolds testified that, on October 8, 2001, he was working his third graveyard shirt, which was from 11:00 p.m. to 7:00 a.m., as a clerk at a Pilot station. Reynolds said that both the inside and outside of the Pilot station were brightly lit. Reynolds testified that, on October 8, 2001, at some point before 4:30 a.m., a man, whom he identified as the Defendant, came in and walked around for a little bit. The Defendant picked up a few items after which Reynolds rang him up as he would have any other customer. Reynolds said that, when he went to give the Defendant his change, the Defendant pointed a gun at him, told him not to press the alarm button, and motioned to where the button was located. Reynolds said that the Defendant came to the back of the counter and told Reynolds to lock the store door and empty the cash registers. Next, the Defendant requested that Reynolds open the safe, and Reynolds complied with this request, but he could only open the lower portion where the change was located. Reynolds said that the Defendant gave him a bag, and Reynolds put the money in the bag. Reynolds had to tell multiple customers to leave and not pump gas, and he told the customers that there had been a toxic spill inside the store. During this time, the Defendant was crouched behind the register with a gun pointed at Reynolds.

Reynolds said that, next, the Defendant told him to get the security tape, and Reynolds told the Defendant that he could not get the tape without the key, which he did not have. The Defendant told Reynolds to get the key or he would shoot Reynolds. Reynolds panicked, and he "ripped the whole VCR down and started unplugging all the wires." Reynolds said that the Defendant put the

VCR in the bag and some of the VCR was sticking out of the bag. Reynolds testified that the biscuit delivery man came to deliver the biscuits, and Reynolds tried to get him to leave by telling him there was a toxic spill. The delivery man would not leave, so Reynolds told him to go to the back door, thinking that the Defendant could leave from the front door. Reynolds said that, after the delivery man went to the back, the Defendant stood up from behind the counter, saw that no one was there, and then he pulled Reynolds toward the front door. As the two were walking out the front door, the Defendant told him to look forward, and Reynolds saw the delivery man out of the corner of his eye. Reynolds said that he heard the Defendant, who was right behind him, say that "[w]e'll be right back."

Reynolds said that the two walked across the street to a dark spot beside a building, and Reynolds felt the Defendant put the gun on the back of his neck and head. He said he saw the Defendant's vehicle, which was a hunter green Ford Explorer, and he thought he was going to have to get into the vehicle. Reynolds explained that the Defendant's car was near an office building, and the area by the office building was illuminated well enough that he could see the color of the Defendant's car. Reynolds said that the robber then shot him, and he estimated that this whole incident lasted between fifteen and twenty minutes. The next thing that Reynolds said that he remembered was flashing lights and people standing around him. Then, he remembered being topless and having his pants removed while a medical technician told him to not try to talk. Reynolds next memory was of waking up in the hospital. He said that, while he was at the hospital, the police showed him a videotape, and Reynolds identified the Defendant as the man who robbed and shot him. Reynolds said that, on the night of this crime, the Defendant had a goatee. As a result of the gunshot, Reynolds has suffered from an inability to remember certain words.

On cross-examination, Reynolds said that, prior to trial, he reviewed his testimony from the preliminary hearing and his statement to police. In his statement to police, Reynolds said that the Defendant's car was "some kind of green color" and described a Sports Utility Vehicle ("SUV"), but Reynolds did not use the word SUV, and he explained that the inability to remember some words is a residual effect of his being shot in the head. He said that, at the time of the interview, he could not remember the word SUV. Reynolds admitted that at the preliminary hearing he testified that the Defendant was driving a Ford Excursion, and not Explorer, but he said that he so testified because he could not remember the word Explorer. Reynolds said that the Defendant's shirt had a hood, but he could not remember if the hood was ever over the Defendant's head. Reynolds said that he was scared when the Defendant threatened him with a gun. He said that, when he was shot, he was facing the Explorer with the building behind him. Reynolds could not recall how many men he viewed in the video lineup when he identified the Defendant.

On redirect examination, Reynolds said that, when he viewed the video lineup, he immediately identified the Defendant. He testified that, while he was scared when threatened with the gun, he thought that the Defendant would rob the store, but not hurt him. Reynolds described the Defendant as "calm" during the robbery. On recross-examination, Reynolds said that he did not remember what the Defendant was wearing on the night of the robbery.

-4-

William E. Snyder, Jr., M.D., testified that he treated Joshua Reynolds, who had been shot in the left temporal region in front of his left ear. He said that, on October 8, 2001, he was on call when Reynolds was brought to the emergency room. The doctor said that he and other doctors performed surgery on Reynolds to remove the bullet fragments that were left in his head, and, after surgery, Reynolds suffered facial weakness on the left side and hearing loss.

Darice Hickson testified that, in October of 2001, her brother, Darian Sparks, lived on Old Guinn Road with his wife, two children, and a friend named Chris Burton. On October 8, 2001, at around 3:00 p.m., she went to Sparks' house with her boyfriend, Daniel Tims, to visit Sparks. Hickson said that, when they arrived at Sparks' house, Sparks was in his yard playing with his two children, and Tims got out of the car to go and speak to him. During that conversation, Sparks mentioned that a friend named "Vito" was coming to the house. Hickson said that, while everyone was standing in the yard, a Ford Explorer, which was either navy or hunter green, pulled down into the driveway and onto the grass, and then it backed down the driveway. She said that the Defendant exited the Explorer and greeted her brother, who then introduced her and Tims to the Defendant. The Defendant said that he was hungry and asked Sparks if Sparks had any food.

Hickson testified that Sparks and the Defendant went into the house, and she followed after about ten minutes to tell Sparks that she and Tims had to leave. She said that she sat down on the couch, and she woke up Burton, who was sleeping on the couch. When Burton awoke, he lit her cigarette, and then went into the kitchen to help prepare spaghetti. Hickson said that, while this was happening, the Defendant was standing in the living room/dining room area. Shortly thereafter, the Defendant went outside and picked up Hickson's niece and put her on his shoulders. He then went to his car, and, when he came back into the house, set down her niece, who grabbed a Michigan hat off of his head. The Defendant said, "Oh, can't mess with the Michigan."

Hickson said that she looked down at her niece and nephew, and then she heard a pop sound. When she looked up, she saw the Defendant's arm extended in Burton's direction, and the Defendant had a gun in his hand. Hickson said that Sparks moved toward his bedroom, and the Defendant said to Sparks, "Don't think about it." Hickson said that the Defendant followed Sparks back toward Sparks' bedroom, and she ran out the front door. She heard another gunshot as she was leaving, and, as she was running, she fell. When she got back up, she continued running and she heard two to three more gunshots. Then, she heard a car leaving, and she saw the Defendant leaving in the car. Hickson estimated that the Defendant was at Sparks' house for approximately fifteen minutes before he shot Burton. Hickson said that she went to a neighbor's house and called 9-1-1. Hickson said that, when she heard the authorities arrive at Sparks' house, she went back to the house, and Tims came from behind the house. Hickson said that Sparks' children were on the floor when the shooting occurred. She said that she did not see any marijuana or money exchanged during this time, and she also did not see Sparks or Burton threaten the Defendant with a gun.

On cross-examination, Hickson agreed that on the 9-1-1 tape recording of her call, she referred to the Defendant's SUV as dark green, and, during her direct testimony, she described the SUV as hunter green. Hickson said that, on the 9-1-1 tape, she repeatedly expressed concern for her

boyfriend, Tims, but she did not express concern for her niece or nephew. She explained that she did not believe that the Defendant would shoot two small children. Hickson denied that she knew the children were safe because Sparks and Tims were "ganging" the Defendant, forcing the Defendant to defend himself. Hickson conceded that, in the statement she gave to police, she referred to the Defendant's SUV as either dark blue or dark green, but she explained that she was panicked at the time. She also agreed that she originally told police that everyone went into Sparks' house together when she first arrived, which was inaccurate. Hickson reiterated that she did not see Burton fall after he was shot, but she conceded that, in her statement to police, she told them otherwise. Hickson estimated that she was inside Sparks' house for approximately five minutes before the shooting occurred.

Hickson testified that, after the Defendant shot Burton, Sparks ran to his bedroom, and she assumed that he went to retrieve a gun. She knew that he owned a .22 caliber rifle, but she never saw him with a pistol. Hickson confirmed that she was the only one who ran out of the front door of the house after the shooting occurred. Hickson said that, at the time that the shooting occurred, Sparks had recently quit his job as the manager of a Wal-Mart, and he was doing some work as a mechanic and some landscaping.

Daniel Tims testified that Hickson is his girlfriend and the mother of his child. Tims said that, on October 8, 2001, he went to Sparks' house at approximately 2:45 p.m. When he arrived, he talked with Sparks for a short while outside, and then the Defendant arrived. Tims remembered that the Defendant drove up in a green Ford Explorer, and he backed down the driveway. Tims said that Sparks introduced him to the Defendant, and the Defendant said that he had just gotten into town, and he was hungry. The three men then went inside, and Sparks started preparing spaghetti. Tims described the mood as friendly, and he thought that, since the Defendant was in the Army, "everything was [alright]." Tims said that Hickson came into the house approximately two to three minutes later. Tims explained that the Defendant then said that he was going to his car and would be right back, and Sparks' daughter said that she wanted to go with the Defendant, and the Defendant said that was fine. The Defendant came back into the house, he set Sparks' daughter down and walked into the kitchen where he pulled out a gun and shot Burton. Tims said the Defendant said nothing before he shot Burton, and, prior to being shot, Burton, who had just woken up, was stirring spaghetti. Tims said that Burton did not have a gun when he was shot.

Tims testified that, after Burton was shot, Sparks ran to his bedroom, and the Defendant said, "Don't even try it, mother f*****." Tims testified that he saw the Defendant point his gun into Sparks' bedroom at Sparks, and then Tims ran out of the back door. Tims said that the Defendant then came outside and fired two shots at Tims as Tims was running away. Tims said that he ran down a hill to a neighbor's house, and he called 9-1-1. Tims said that he was panicked, and he then ran to three other houses, one of which was owned by Sparks' cousin, who took Tims back up to Sparks' house. There, Tims saw that the police and an ambulance had arrived. Tims said that the police took him to the Sheriff's Department where he identified the Defendant in a lineup.

On cross-examination, Tims said that when he made the 9-1-1 call he expressed concern for

Burton, whom he called his "boy[]," and for Hickson, but he did not mention that there were two small children in the house. He explained that he was panicked, and he denied that he did not mention the children because he knew they were not in danger since the Defendant was defending himself. Tims remembered that, before the Defendant arrived, Sparks was talking on his cell phone giving directions to someone, and he assumed that he was giving directions to the Defendant. Tims conceded that, at the preliminary hearing, he testified that the Defendant's SUV was either dark blue or dark green. Tims said that Sparks owned a nine millimeter gun, .22 caliber handgun, and a .22 caliber rifle. Tims agreed that he testified at the preliminary hearing that the Defendant's gun looked like "a .380" and that it was black. He also agreed that he testified that Burton was facing away from the Defendant, shutting the refrigerator, when he was shot. Tims said that, after the Defendant shot at Tims, Tims fell to the ground and pretended that he had been shot, and then he jumped up and ran to a neighbor's house. Tims said that he was unemployed at the time of this incident, and he denied that he was dealing drugs to sustain himself. Tims estimated that the shooting occurred at 3:15 p.m., and then he listened to the 9-1-1 tape that indicated that he called 9-1-1 at 3:02 p.m.

Darian Sparks testified that, in October of 2001, he was living with his wife, two children, and Chris Burton, and, at that time, he was using the drug ecstasy. Sparks said that, on October 8, 2001, the Defendant called him and said that he was coming back into town and asked if he could come over to discuss something. Sparks assumed that the Defendant was interested in a drug deal involving ecstasy. Sparks said that he knew the Defendant because they were both involved in the "club scene" together. Sparks testified that, when the Defendant arrived, Burton was asleep on the couch inside the house, and Sparks' children were also inside. He was outside with Hickson and Tims, and they saw the Defendant back his green Explorer down the driveway. Sparks said that, when the Defendant arrived, he seemed nervous and antsy, but he was acting friendly toward Sparks' children.

Sparks testified that, at some point, they went inside the house, and he started making spaghetti for the children. Burton took over making the spaghetti, and the Defendant was playing with the children. Sparks testified that the Defendant went out to his truck with Sparks' daughter, and then he came back in, set his daughter down, and pulled out a gun and shot Burton, shot Sparks, and then left. Sparks said that, after he was shot, he went to his bedroom to get a gun and defend himself. Sparks said that he was able to get his gun, but he could not put a bullet in the chamber because the Defendant had shot him in his arm, rendering his arm unusable. Sparks said that, when he was attempting to load his gun, he heard the Defendant fire two or three more shots from the back porch, and Sparks hid in his walk-in closet. Sparks said that he then heard tires spin out of the driveway, so he went out to check on his children who were crying near Burton and saying, "Don't let my daddy die. Don't let [Burton] die . . . ."

Sparks said that he checked Burton for a pulse, and, feeling none, he then walked out to the back of the house to see if Hickson or Tims was shot. Sparks said that he went back to the closet, his daughter handed him a phone, and he called 9-1-1. The next thing he remembered was waking up when the police were there. Sparks said that he had a drug problem at the time of this incident, and, while he still had a drug problem at the time of the trial, it was no longer as bad. Sparks said

that, at the time of the shooting, he was carrying $300 in cash, and he had more money hidden under the floor mat of his car, which was in his driveway. Sparks said that the Defendant knew that he had money on him because he counted the money in front of the Defendant. Sparks admitted that he had previously been convicted of attempting to sell ecstasy in 2002 and of robbery.

On cross-examination, Sparks said that he was sedated at the time that he gave his statement to police, and he did not remember what he said to them. Sparks said that he was never given a copy of this statement, and he did not read it in preparation for trial. Sparks admitted that, at the time of this incident, he was being sued by Children's Hospital, and he said that he kept money in the floorboard of his car because he had previously had a safe stolen from his home. Sparks denied that he hid money, drugs, and VCRs, after the shooting but before the police arrived. He conceded that he did not remember everything that he did after he was shot. He agreed that his blood was on his stairs on his back porch and in his car but did not remember why he went down the stairs or to his car, and he explained that he was bleeding very badly from being shot and was therefore dizzy and felt faint. Sparks said that he had two weapons in his house, a .22 caliber Smith & Wesson target pistol and a Cobra Mac 11, which is a nine millimeter handgun. Sparks said that neither Burton nor Tims had a weapon at the time of the shooting. Sparks identified a picture from a trash can that had the cover of a box of .380 automatic Federal ammunition, but he denied owning a gun that used this type of ammunition. Sparks conceded that he had told police that he was shot before Burton, but he said that he was mistaken and that Burton was actually shot first.

Sparks said that he remembered the police asking him where the VCR was, and he told them that it was in his living room attached to the television. He said that, at that time, he did not know that the Defendant had robbed a Pilot station. Sparks read his statement to police, in which he told them that he had three VCRs in his house. Sparks said that he knew both Tate Shaffer and Christopher Pearson, and they were both friends of his and had lived with him at one time. He explained that Pearson's wallet was in his house, along with some other items, because Pearson had gone to jail, and Sparks was keeping his things until he returned.

Sparks denied that any harsh words were spoken by anyone before the shooting. He said that he did not remember if, after Burton awoke, Burton greeted the Defendant in any way, but he was sure they did not exchange harsh words. Sparks said that he counted out his money in front of the Defendant because he "might have" been considering buying something. Sparks then said that they were, at that time, discussing ecstasy pills. He said that the Defendant asked him if he had any ecstacy pills, and then he counted his money to see if he would have to borrow money to get the Defendant the pills. Sparks said that he had between $1600 and $1700 hidden in his car at the time of this incident. He explained that he had just cashed in some of his stock purchases, and he was hoping to pay off Children's Hospital with the money. Sparks conceded that he had previously stated that he tried to hide his money from the Defendant after the Defendant shot him and that he got this money from doing odd jobs, and not from cashing his stock purchases. Sparks said that he did not have trash pickup at his house, and he did not remember the last time that he took his trash to the dump.

Terry Lee, a lieutenant with the Knox County Sheriff's Office, testified that he is the supervisor of the forensics services division within the sheriff's office. He said that, on October 8, 2001, he responded to a call on Old Guinn Road where he took photographs and made sketches of the crime scene. The lieutenant said that, at the crime scene, he saw that someone had recently been cooking spaghetti. Lieutenant Lee also noted that the crime scene was relatively neat, which indicated to him that there was not a struggle before the shooting. The lieutenant said that he saw, and photographed, a Federal .380 caliber shell casing, and he said that this casing could have come from someone shooting that type of gun or it could have been transferred by officers going in and clearing the area. In the closet of the master bedroom, the lieutenant found an M-11 nine millimeter weapon and another Federal caliber casing. He also found a bag that contained a .22 caliber handgun, a box that would hold ammunition, and money in the amount of $380 that was spattered with blood. The officer also found several other shell casings, and he testified that he did not attempt to determine whether the shells were fired.

Lieutenant Lee identified a photograph that he took of Burton's body. He said that Burton was wearing athletic shorts and a T-shirt and Burton's body was lying face-down with his left hand underneath him, his left leg bent, and his right leg straight. He said that, from the body, he determined that Burton was shot in the back of the head. The lieutenant also noticed some droppings of blood on the body that indicated that perhaps someone who was bleeding walked by the body, and he saw what looked like a tooth near the kitchen. Lieutenant Lee also participated in the search of the Defendant's car, a Ford Explorer, from which the police recovered several rolls of change in the center console and a gun under the driver's seat. The lieutenant also found a baseball cap with an "M" on it, which is the registered trademark for Michigan.

On cross-examination, the lieutenant testified that the bag that he found in the closet of the master bedroom was red and blue and was striped. Lieutenant Lee said that he also found two live .22 caliber rounds on the front porch, and, in a trash can outside the residence, the lieutenant found spent .380 caliber shell casings and .12 gauge shotgun shells. Lieutenant Lee found .380 caliber shell casings and an empty box of this type of ammunition, but he did not recover a gun from the house that used this caliber of shell. The lieutenant testified that, in a Ford Aspire that was parked in Sparks' driveway, he found $1690.07 underneath the floor mat of the passenger's side and a "green, leafy substance" underneath the driver's side floor mat. The lieutenant found a wallet that contained Christopher Pearson's driver's license, and several other cards registered in this name, in the entertainment center in the living room. Lieutenant Lee found a wallet with the driver's license of Tate Shaffer underneath the couch in the living room. Lieutenant Lee identified a picture that he took of the laundry room, which had a pile of clothes in it, and he conceded that some of the clothes might have been black. The lieutenant noted that there was blood in the laundry room, indicating that someone who was bleeding had been in that room. The lieutenant said that he also found and photographed blood in the bathroom, bedroom, and living room. Lieutenant Lee found a red and blue bag in the closet of the master bedroom that contained a .22 caliber semiautomatic handgun and money. The lieutenant noted that the money appeared to be stained with blood.

The lieutenant testified that he was present when the police searched the Defendant's vehicle.

He admitted that the officers did not find a black sweatshirt with a hood, any other clothes, a VCR, a VHS tape, or a red and blue bag in the Defendant's car. The lieutenant testified that the Defendant's Ford Explorer looked bluish green or aqua in some of the pictures. On redirect examination, the lieutenant testified that the blood-stained money that he found in a bag in the closet of the master bedroom consisted of two $100 bills and nine $20 bills.

Sandra Elkins, M.D., testified that she is an Associate Professor of Pathology at the University of Tennessee and she serves as the Knox County Medical Examiner, and, after hearing her qualifications, the trial court recognized her as an expert in anatomical and forensic pathology. Dr. Elkins testified that, around October 8, 2001, she performed an autopsy on Christopher Burton, who was seventy inches tall, and she found that the cause of death was a gunshot wound to the right upper back of his neck. She said that Burton was shot from a distance of more than two to three feet, and he would have died at a maximum of ten to fifteen minutes after being shot. On cross-examination, the doctor testified that the bullet traveled through Burton in a downward direction, entering at sixty-three inches above his heel and exiting at sixty-one inches above his heel. On redirect examination, the doctor clarified that a two-inch trajectory could have been created by the shooter shooting straight at Burton while Burton's head was slightly tilted.

Shelly Betts, an agent with the Tennessee Bureau of Investigation ("TBI") assigned to the firearms identification unit at the crime laboratory in Nashville, testified, as an expert, that she investigated the firearm that was found in the Defendant's vehicle. She said that she determined that it was in normal working condition, and she fired and recovered bullets and casings from this gun. She compared the fired cartridge casing found at the scene of the Pilot station robbery with the cartridge casing that she recovered from the gun in the Defendant's vehicle, and she determined that the two casings had been fired from the same gun. On cross-examination, the agent said that the empty box of ammunition that was found in Sparks' trash can was never submitted to her for analysis.

Detective Tom Cox, an officer with the Knox County Sheriff's Office, testified that he was assigned to assist in the investigation of the shooting at Sparks' house. He said that several other officers were there when he arrived at the scene, and, after doing a brief assessment of the scene, he interviewed Tims. He described both Tims and Hickson as "very upset." He said that, when he arrived, he saw Burton's body on the ground, and he saw that a pot of spaghetti had boiled over on the stove. Detective Cox said that he had been told by Tims that, shortly before the shooting, Burton had been lying on the couch in the living room, and, when the detective went into the living room he noticed that there was a depression and some bedding on the couch. He also noticed a lighter lying on the floor close to the couch, which was consistent with Hickson's statement that Burton had lit her cigarette. Detective Cox said that he did not see anything that would have been consistent with a struggle or altercation; there was no evidence of physical activity or disturbance. The detective said that he interviewed Sparks while Sparks was hospitalized. Detective Cox said that he was present in the hospital with Joshua Reynolds when Reynolds viewed a video lineup. He said that Reynolds had "absolutely no hesitation" when he identified the Defendant as the man who had shot him after the Pilot station robbery.

The detective said that as a result of an alert the Defendant was arrested in Knox County while driving a green Ford Explorer. Detective Cox said that the amount of money found in the Defendant's car was consistent with the amount that was taken from the Pilot station. The detective also said that the vehicle that the Defendant was driving was the same as the vehicle involved in both crimes.

The detective testified that he ran the serial number and "descriptors" of the gun found in the Defendant's car to determine whether it had been stolen. He said that the check came back negative, meaning that the gun had not been reported stolen. Detective Cox said that the gun's registration was checked by Captain Johnson almost immediately after the weapon was taken into custody. He said that the gun was purchased in April of 2001 by a man named DeLou who then resided in Sevierville.

On cross-examination, the detective said that he was assigned to the shooting at Sparks' house, but the Pilot station robbery was not his case. He said that he, therefore, did not look for the VCR taken from the Pilot station or a black hooded sweatshirt in Sparks' house. He also conceded that, while the evidence apparently supported the statements given to him by Hickson and Tims, he found it difficult to understand why the Defendant started shooting for seemingly no reason. Detective Cox agreed that he was disturbed by the inconsistencies between Sparks' statement that he gave to the detective shortly after this crime and Sparks' trial testimony. The detective said that he did not recover a VCR or a VHS tape from the Defendant's car, and he did not recover any clothing other than what the Defendant was wearing. Detective Cox testified that he sent the clothes that the Defendant was wearing, including his shoes, for testing and no blood was found on any of the articles of clothing.

Detective Cox testified that the report about the registration of the gun found in the Defendant's car was requested on December 9, 2003, and it was sent back on December 24, 2003. He said that the report indicated that the person to whom the gun was registered was born on January 4, 1974. The detective said that, to his knowledge, no one from the sheriff's department had attempted to contact the registered owner of this gun. Detective Cox said that Sparks said that he was unemployed, and, in Sparks' statement, he did not mention any stocks or bonds. Sparks told the detective that he got money from doing odd jobs. The detective conceded that he never went back to Sparks' house to look for a VCR or clothing.

In his own defense, the Defendant called Kimberly Moore, who testified that she met the Defendant when he took her daughter to Nashville. Moore explained that the Defendant took her daughter to school at around 10:00 p.m. on Sunday night, and, the following Monday, she heard that the Defendant had been arrested for robbing a Pilot station. She said that he looked different in court than he had the night he took her daughter to school, and she recalled that he was bald and had little, if any facial hair, and he looked in court like he had gained a little weight. On cross-examination, Moore testified that Knoxville is about 177 miles from her daughter's school, Tennessee State University ("TSU"), in Nashville. Moore admitted that she did not know what time her daughter and the Defendant got to TSU, and she did not know what time the Defendant returned to Knoxville.

Destiny Moore testified that, in October of 2001, the Defendant drove her to school at TSU. She said that, the next day, her mother called her and told her that the Defendant had been accused of shooting someone at a Pilot station and shooting someone in a home. She said that the Defendant picked her up at around 10:00 p.m. on a Sunday night, and it takes three or three and one half hours to get to her school, in Nashville. Moore said that it was at least midnight when they arrived because she remembered that the Defendant was not allowed on her floor, and no men are allowed on her floor after midnight. She said that she talked to the Defendant for about thirty minutes, said good-bye, and the Defendant left. On cross-examination, Moore admitted that she had previously said that the Defendant picked her up between 9:00 p.m. and 10:00 p.m., and she conceded that she never went to the police with this information.

The Defendant testified that he was born in Michigan, raised in Knoxville, and he graduated from high school and started his first year of college. The Defendant said that he flunked out of college and then joined the military. In the military, the Defendant was in Operation Desert Storm, and he got a bronze star for his efforts there. The Defendant said that, when he returned from the war, he worked as a cook for a year or two, and then he left and obtained employment with Knoxville Parks and Recreation as an athletic coordinator, and this is where he was employed on October 8, 2001. The Defendant said that he did not rob the Pilot station, and he did not shoot Reynolds. He admitted that he was at Sparks' house, and he admitted that he shot Burton. The Defendant claimed that he shot Burton to protect himself.

The Defendant said that, on October 7, 2001, he went to Destiny Moore's house to pick her up and take her to school in Nashville. He said that he got to Moore's house at around 10:00 p.m., and he estimated that it took them three hours and fifteen minutes to get to Nashville. The Defendant said that they stopped for gas, and then he assisted Moore with her bags and walked to her dorm with her. He said that he was not allowed to go past the guard, and he remembered that it was around 1:00 a.m. He said that Moore went upstairs with her bags, and then she came back down and they talked for a little bit before he headed back to Knoxville. He estimated that he left Nashville at around 2:00 a.m. The Defendant said that, on his way back to Knoxville, he did not stop at the Pilot on Northshore where the robbery occurred, but he went home and went to bed.

The Defendant said that, on the morning of October 8, 2001, he awoke between 11:30 a.m. and 12:30 p.m., and he received a phone call from Sparks saying "I got the money all together" for some marijuana that the two had previously spoken about. The Defendant admitted that he supplemented his income by selling marijuana, and he sold marijuana in quantities of one quarter pound or more. The Defendant said that he met Sparks and Burton at a night club, and he had known them for a couple of months. He estimated that he had sold marijuana to Sparks and Burton on three or four occasions before October 8, 2001, and they would meet at a gas station every time. He said that he would get to the gas station approximately fifteen minutes before they conducted the transaction to ensure that there were no police present. Then, Sparks and Burton would arrive by car and pull up beside him. They would both get out and get in his truck and that was where they would exchange the money for drugs. The Defendant said that the two were always armed. He said that they "raved" about their guns and that they loved their guns.

-12-

The Defendant testified that October 8, 2001, was the first time that he had ever been to Sparks' house. He said that, a week before, he had talked with Sparks about Sparks' interest in purchasing one pound of marijuana for $1000. When Sparks called him on October 8, 2001, he told the Defendant that he did not want to meet at a gas station because he had his children, and one of them was a little sick. He asked the Defendant to bring the marijuana to his house, and the Defendant agreed. The Defendant said that he did not know where Sparks lived, and Sparks had to give him directions. He said that he originally passed Sparks' driveway, so he backed up and backed down the driveway. He said that, when he got there, he saw Sparks, two other white guys, and a white female. He said that he was introduced to the men, one of whom was Tims and the other was Tate Shaffer. The Defendant said that there were no kids outside, and Burton was not outside.

The Defendant said that he had the pound of marijuana with him when he got to the house, but he did not get it out of the car with him, and he left it on the floorboard of his passenger's seat. He described the scene as "okay," but he said that it was a little suspicious because Sparks had not told him that there were other men there with him. The Defendant said that, next, everyone walked inside, and, when he got inside, he saw two children and Burton, who was awake. Then, Sparks said that he had to go to the restroom, and the Defendant played in the living room with the children for a little while. It occurred to the Defendant that neither one of the children was sick, but he said that he was not nervous at that point. From his vantage point in the living room, the Defendant saw an M-11 sitting on the corner of the bed in Sparks' bedroom. The Defendant said that Sparks came out of the restroom and asked the Defendant if he was ready to make the deal, to which the Defendant responded affirmatively. The Defendant said he asked Sparks if Sparks had the $1000, and Sparks said yes, and he pointed to the counter and said that the money was "right there." The Defendant said that he gave Sparks a sarcastic look because the money was all in change and dollar bills, and Sparks said, "Well, it all spends the same."

The Defendant said that, as he was going out to his car to get the marijuana, Sparks' daughter tugged at his pant leg and asked if she could have a piggy-back ride outside. He agreed and took the girl to the car with him and retrieved the marijuana, which was in a brown paper bag. The Defendant said that he did not have any weapons with him that day. Once he got back inside, he pulled Sparks' daughter off of his shoulders and set the marijuana on the counter, and Sparks took the drugs. Sparks told the Defendant to get his money, and, as the Defendant was taking the money, Sparks said, "This doesn't feel like a pound of weed." The Defendant told Sparks that he had weighed it himself, but Sparks did not believe him. The Defendant said that Tate and Tims started yelling at him, and then Burton told him that the weed did not even look good anyway. The Defendant said that they then got into a heated argument about the quality and the quantity of the marijuana.

The Defendant said that he saw Burton pull up his shirt and reach for a gun, and the Defendant tackled him, and got the gun out of his hands. Once he grabbed the gun, Burton said, "Shoot him, you all; shoot his a**." The Defendant said that he expected to be shot at any second, and, as he and Burton were standing back up, he shot the gun and then backed into the living room. The Defendant saw Tate grabbing for a gun, and he saw Sparks running into his room. The Defendant said that he told Sparks, "Don't try it, mother f*****," meaning do not try to grab a gun,

but Sparks went for his gun anyway, so the Defendant shot him. The Defendant said that he went to the back to see where the other men were, and he saw Tims and Tate running away from the house, and Tate still had a gun in his hand. He fired his gun twice into the air to run them off. The Defendant said that he then saw the children screaming in the living room, and he got into his car and quickly drove away. The Defendant said that he did not think to call the police because he was nervous about what had happened at Sparks' house. The Defendant went to a park, where the police came and arrested him. The Defendant said that the gun that he was found with belonged to Burton, and he was never at the Pilot station. He said that he shot Burton and Sparks because he was afraid for his life.

On cross-examination, the Defendant admitted that he was at Sparks' house for the purpose of conducting a drug deal. He agreed that he shot and killed Burton, he shot Sparks, and, on the outside porch, he shot at least two times. The gun that he shot was a .380 handgun, which he took with him and placed underneath the front driver's side of his truck. The Defendant agreed that he was wearing a black hat that had an "M" on it for Michigan. The Defendant conceded that the shell casing found at the Pilot station matched the gun found in his possession. He also conceded that Wycoff and Reynolds identified him as the man involved in the Pilot station robbery.

The Defendant agreed that he was employed working with children at the time of these crimes, and he said that no one knew, at the time, that he was a drug dealer. He said that he had been a drug dealer for a little over one year, and he conceded that he was, in essence, living a double life. The Defendant could not explain why, since he wrestled Burton in the kitchen, the kitchen stool was not knocked over. He said that they did not wrestle, but he tackled Burton and knocked him straight backward. He said that he is an athlete, and he can "form tackle excellently," which was why he did not knock over the stool.

The Defendant then conceded that he was convicted in New York in 1994 for felony weapons possession, and he said that he lied to the New York court, telling it that his name was Marcus Brown. He said that, in 1996, he was convicted of another felony weapons possession charge. The Defendant again denied that he had a weapon with him on October 8, 2001, and he reiterated that he took Burton's gun away from him.

The Defendant admitted that, when he was arrested, the police took a cell phone from his car. He said that, at around 2:48 p.m. on October 8, 2001, before he went to Sparks' house he received a message from someone that he had listed as "White Boy," which was Sparks. He said that he never checked his messages. The Defendant also admitted that, at 2:28 p.m., he received a message from "Dray," and he said that he knows several "Drays," none of whom are crack dealers.

Over the Defendant's objection, the trial court allowed the State to offer some rebuttal proof. Reynolds, the victim at the Pilot station, was recalled, and he looked at the picture of Burton and said that there was no way that Burton was the man who robbed him at the Pilot station. He said that his hair and his facial hair were different from the robber's hair and facial hair. Reynolds also said that he recognized the Defendant's voice as the same as the voice of the man who robbed him. On cross-

-14-

examination, Reynolds admitted that he had heard all the testimony in this case, and he heard the Defendant's defense that Burton committed this crime.

Based upon this evidence, the jury convicted the Defendant in case number 73803 of one count of attempted first degree murder, one count of especially aggravated kidnapping, and one count of especially aggravated robbery for his actions at the Pilot station. In case number 73804, the jury convicted him of the first degree murder of Burton and the attempted first degree murder of Sparks. The Defendant was automatically given a sentence of life imprisonment for the first degree murder conviction.

## B. Sentencing Hearing

At the sentencing hearing, after arguments of counsel, Reynolds testified about the extent of his injury from being shot in the head by the Defendant. He said that he has had brain surgery and he has residual problems, including headaches, being deaf, and problems with his jaw. He said that he suffers some memory impairment and has gained weight as a result of the medications that he is now required to take. He said that he and his family have emotionally suffered from this event.

Debbie Mickens, Burton's mother, testified that, as a result of her son's murder she has suffered from depression. She also said that Burton's murder has emotionally affected his eighteen-year-old brother. She asked the trial court to impose the maximum sentence.

Based upon this evidence, the arguments of counsel, and the Defendant's presentence report, the trial court found that the Defendant was a Range I, standard offender, and that the range of punishment for each of the Class A felonies was fifteen to twenty-five years. The trial court, in case number 73803, merged the Defendant's especially aggravated robbery conviction with his especially aggravated kidnapping conviction, and then it sentenced the Defendant to two consecutive twenty-five year terms for his attempted first degree murder and especially aggravated kidnapping convictions. In case number 73804, the trial court sentenced the Defendant to twenty-five years for the attempted first degree murder of Sparks, and it ordered that this sentence run consecutively to the Defendant's life sentence for the first degree premeditated murder of Burton. The trial court then ordered that the sentences in case number 73803 run consecutively to the sentences in case number 73804, for an effective sentence of life plus seventy-five years.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain any of his convictions; (2) the trial court erred when it ruled on several different evidentiary issues; and (3) the trial court erred when it sentenced him.

## A. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to sustain any of his

convictions. When the sufficiency of the evidence is challenged, the standard of review is whether, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Questions regarding the credibility of witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. Id. When a defendant challenges the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Vaughn, 29 S.W.3d 33, 39 (Tenn. Crim. App. 1998). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Case Number 73803 – Especially Aggravated Robbery, Especially Aggravated Kidnapping, and Attempted First Degree Murder

Regarding his convictions in case number 73803, the Defendant contends that the evidence is insufficient to sustain his convictions for especially aggravated robbery, especially aggravated kidnapping, and the attempted first degree murder of Reynolds. The Defendant asserts that no rational juror could have found him guilty beyond a reasonable doubt because he was convicted primarily based upon the conflicting eyewitness testimony of Reynolds and Wycoff. He does not argue that the State did not prove the elements of these crimes, but, rather, he asserts that the evidence did not establish his identity as the perpetrator of these crimes and that there was unexplained evidence that proved the Defendant's theory that Burton committed these crimes. He asserts that Reynolds testimony is particularly "suspect" because he was shot in the head and suffered memory loss. The State counters that the witnesses' testimony did not conflict, and there was additional evidence that led to the Defendant's conviction.

As previously stated, the Defendant contends that the State presented insufficient proof of his identity as the perpetrator. The State must prove beyond a reasonable doubt that the accused is the person who committed the offense. See State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995). Identity of the accused may be accomplished by either direct or circumstantial evidence, or both. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975); State v. Keith Salter, No. W2004-01255-CCA-R3-CD, 2005 WL 1353293, at *3 (Tenn. Crim. App., at Jackson, June 7, 2005), *no Tenn. R. App. P. 11 application filed*. The determination of identity is a question of fact for the jury after a consideration of all competent evidence. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. State v. Radley, 29 S.W.3d 532, 536 (Tenn. Crim. App. 1999) (citing Strickland, 885 S.W.2d at 87-88). Inconsistency, inaccuracy, and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for

-16-

the jury to consider in determining the weight to be given the testimony. Id. Further, although inconsistencies or inaccuracies may make a witness less credible, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory so as to create a reasonable doubt of the defendant's guilt. Id.

In the case under submission, we conclude that the evidence was sufficient to prove the Defendant's identity as the perpetrator of these crimes. Again, on appeal we view the evidence in the light most favorable to the State. In that vein, the evidence proved that, on October 8, 2001, Reynolds saw the Defendant enter the Pilot sation, and, after purchasing some items, the Defendant pointed a gun at Reynolds and demanded money. The Defendant took the money, much of which was rolled change, and the security tape from the Pilot, and, Wycoff saw the Defendant exit the store walking behind Reynolds. The Defendant forced Reynolds across the street by holding him at gun point, and then he shot him in the back of the head. Reynolds said he clearly saw the Defendant in the well-lit Pilot station, and he also recognized the Defendant's voice, and he identified the Defendant's car as a green Ford Explorer. Wycoff said that he made eye contact with the Defendant, who spoke to him, and he was sure that the perpetrator of this robbery was the Defendant. The Defendant was arrested while in a green Ford Explorer, and he was in possession of rolled change and the gun that was proved to be the same as the gun that shot Reynolds. While the Defendant offered some explanation, the jury did not accept that explanation. The positive identification testimony of the witnesses, Reynolds and Wycoff, along with the other evidence tying the Defendant to the crime, sufficiently supports the Defendant's convictions.

### 2. Case Number 73804 – First Degree Premeditated Murder and Attempted First Degree Premeditated Murder

In case number 73804, the Defendant contends that the evidence is insufficient to sustain his convictions for premeditated first degree murder and attempted first degree murder because there was no proof of premeditation. The State counters that the eyewitnesses to these crimes provided ample testimony to prove premeditation, and the jury accredited this testimony, which is within its province. Accordingly, the State asserts, the evidence is sufficient.

First degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2) (2003). Premeditation is defined as follows:

As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and

-17-

passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d). Davidson, 121 S.W.3d at 615. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). The Tennessee Supreme Court previously identified the following circumstances as supporting a finding of premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). However, these factors are not exhaustive. Davidson, 121 S.W.3d at 615; see State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998) (holding that establishment of a motive for the killing is a factor from which the jury may infer premeditation); State v. Bush, 942 S.W.2d 489, 501-02 (Tenn. 1997) (holding that premeditation also may be inferred from the use of multiple weapons in succession); see also State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001) (finding evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient to establish premeditation).

We conclude that the evidence, when examined in the light most favorable to the State, was sufficient to support the jury's finding that the Defendant acted with premeditation when he shot and killed Burton. The evidence proved that the Defendant came into Sparks' home and then left again carrying Sparks' daughter. The Defendant went to the car, retrieved a gun, came back into the home, set Sparks' daughter down, and then he shot Burton. The eyewitnesses to this shooting testified that the Defendant was calm prior to the shooting, and Burton was unarmed when the Defendant shot him. After the Defendant left Sparks' house, he did not call police, and he drove to a park where he sat in his car and waited for police, indicating that he was calm after the murder. This evidence sufficiently supports the jury's finding that the Defendant acted with premeditation. Although the Defendant contends that the jury's verdict is not rational because there were numerous inconsistencies between and within the accounts of the various witnesses, this Court does not re-weigh or reevaluate the evidence on appeal. As noted above, the weight and value to be given to the evidence, and the credibility to be given to witnesses, is left to the jury. Davidson, 121 S.W.3d 614.

Similarly, we conclude that the evidence is sufficient to sustain the jury's finding that the Defendant acted with premeditation when he shot Sparks. Two of the factors that the Tennessee Supreme Court has articulated as considerations in this regard are: the defendant's threats or declarations of intent to kill and the defendant's calmness after a killing. The Defendant admitted, and all the witnesses agreed, that prior to shooting Sparks the Defendant said, "Don't even think

about it mother f*****." He then followed Sparks into Sparks' bedroom and shot him. Further, as we previously stated, there were indications that the Defendant was calm after this shooting. In light of this evidence, the evidence is sufficient to sustain the Defendant's conviction for attempted first degree murder. He is, therefore, not entitled to relief on this issue.

## B. Evidentiary Issues

The Defendant contends that the trial court erred when it ruled on several evidentiary issues. He states that the trial court erred when it: (1) allowed the State to impeach the Defendant with his two prior felony weapons possession convictions; (2) did not allow the Defendant to cross-examine Sparks about the details surrounding his aggravated robbery conviction; (3) did not allow Sparks' probation officer to testify; (4) allowed Reynolds to testify as a rebuttal witness; (5) denied the Defendant's request for early Jencks material; and (6) ruled that the Defendant's counsel had improperly cross-examined Detective Lee. The State counters that the trial court did not abuse its discretion in any of evidentiary rulings, and, even if it had, any abuse was harmless.

### 1. Prior Felony Convictions

The Defendant asserts that the trial court erred when it allowed the State to impeach him using his two prior convictions for felony possession of a weapon. "When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1992).

Pursuant to Rule 609, Tennessee Rules of Evidence, the credibility of the defendant may be attacked by presenting evidence of prior convictions if certain conditions are met. First, the State must give reasonable pretrial notice of the impeaching convictions. Tenn. R. Evid. 609(a)(3). Second, the convictions must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Third, less than ten years must have elapsed between the defendant's release from confinement on the prior conviction and the commencement of the instant prosecution. Tenn. R. Evid. 609(b). Finally, the impeaching conviction's probative value on credibility must outweigh its unfair prejudice. Tenn. R. Evid. 609(a)(3). In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should consider the similarity between the crime in question and the underlying impeaching conviction, as well as the relevance of the impeaching conviction with respect to credibility. State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion. State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). A trial court should first analyze whether the impeaching

conviction is relevant to the issue of credibility. Waller, 118 S.W.3d at 371. Rule 609 of the Tennessee Rules of Evidence suggests that the commission of any felony is "generally probative" of a criminal defendant's credibility. Id. However, the Tennessee Supreme Court has rejected a per se rule that permits impeachment by any and all felony convictions. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). A prior felony conviction still must be analyzed to determine whether it is sufficiently probative of credibility to outweigh any unfair prejudicial effect it may have on the substantive issues of the case. Waller, 118 S.W.3d at 371. To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or false statement. Id.

A trial court's ruling under Rule 609 will not be reversed absent an abuse of discretion. Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979). A trial court abuses its discretion in this regard only when it "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

### a. 1994 Felony Weapons Conviction

The Defendant contends that the trial court abused its discretion when it allowed the State to cross-examine him about his felony weapons conviction in New York from 1994. The Defendant's counsel filed a motion in limine regarding this conviction. The Defendant's counsel told the court that he was concerned about the State referring to the charge as being a "felon in possession of a handgun," and he was concerned that the State would introduce evidence that proved that the gun that the Defendant possessed was later linked to a different homicide that was committed in Tennessee. The Defendant was tried for that homicide, and the jury was hung, and he was never convicted of that crime. The State agreed that it would not mention the other homicide, and then the following occurred:

> [State]: Your Honor, we can refer to [the 1994 conviction] as a weapons conviction. A felony weapons – a weapons conviction.
> [Defendant's Counsel]: That would be fine. That's fine.
> [State]: Not a felon in possession of a weapon.
> [Defendant's Counsel]: That's why I was being more specific.
>
> . . . .
>
> [State]: But we will refer to it as a felony weapons charge. Okay? Not a felon in possession of a weapon. We just need to establish that it's a felony conviction.
> [The Court]: Right. Yes. I understand.
> [State]: And that he gave a false name. . . .
> [Defendant's Counsel]: That's fine.

Further, prior to the Defendant testifying, the Defendant's counsel stated, "We both would agree that

the New York conviction the State can use for impeachment." During the trial, the Defendant's counsel again told the court that the parties had agreed that this conviction could be used for impeachment.

Tennessee Rule of Evidence 103 provides in pertinent part:

(a) Effect of Erroneous Ruling.--Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection.--In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context; . . . .

To preserve an evidentiary issue for appellate review, an aggrieved party must make an objection to the offer of the evidence, thus affording the trial court the opportunity to pass on the objection. Tenn. R. Evid 103(a); Tenn. R. App. P. 36(a); State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000).

In the case under submission, the Defendant's counsel filed a motion in limine to exclude a number of convictions. The record reveals that he was particularly concerned with the fact that the gun that was the subject of this 1994 weapons possession conviction was later linked to a homicide in Tennessee, a crime for which the Defendant was tried but not convicted. He agreed at the hearing on the motion in limine to allow the State to question the Defendant about this conviction, and the State agreed to limit its questioning. During trial, the Defendant's counsel again told the trial court that the parties had agreed that the State could impeach the Defendant with this conviction. Under these circumstances, where the Defendant failed to object to the evidence about which he now complains, we conclude that he waived his ability to argue on appeal that the trial court abused its discretion when it allowed the State to question him about this conviction. Therefore, the Defendant is not entitled to relief on this issue.

### b. 1996 Felony Weapons Conviction

The Defendant next contends that the trial court abused its discretion when it allowed the State to question the Defendant about a 1996 felony weapons conviction. He asserts that he did not have reasonable written notice of the impeaching conviction because the State did not file the notice until the morning of trial and that the probative value of this evidence was far outweighed by its prejudicial effect. The Defendant notes that, during cross-examination, the State first asked him if he had a gun with him on the day that he shot Burton, and the Defendant denied again that he had a gun with him. The State then asked if he had previously been convicted of felony weapons possession in 1994, and the Defendant admitted that he had. The State next asked if he had been convicted of felony weapons possession in 1996, and the Defendant admitted that he had. The State next said, "But on October 8th, 2001 while you're making a drug deal out in the country with a bunch of white men, hum, you didn't feel it necessary to take a gun with you . . . ." He asserts that his previous convictions were, therefore, used inappropriately because they were not used to attack his credibility but were used to show his proclivity to carry a gun. The State counters that this line

-21-

of questioning went directly to attack the Defendant's truthfulness about whether he was armed when he went to Sparks' house. Further, the State asserts that, if any error exists, it is harmless.

At trial, before the Defendant testified, the Defendant's counsel requested that the trial court address whether the State could impeach the Defendant with his 1996 conviction, asserting, in part, that it was filed late. The trial court noted that the Defendant did not seek a continuance. The Defendant's counsel contended that he did not think that he would be granted a continuance, and he further contended that this conviction "doubled" the other conviction and that it did not go to truthfulness. The State told the trial court that, while it had not filed notice of this conviction until the morning of trial, the Defendant had notice of this conviction from documents provided him during discovery in his NCIC report. The trial court then stated:

> I think that the – we have excluded a number of different things, and certainly we . . . all have agreed that the case in New York County, New York, does come in. You all had some knowledge of this prior conviction, even if it was not a felony. Certainly, everybody had knowledge of it – at least you all did; I didn't – prior . . . to this time, and it was filed late. I am going to allow the State to get into that particular conviction.

At the motion for new trial, the trial court stated that this conviction was "probative of the various issues in this case where [the Defendant] claims that he . . . didn't do anything and it must have been somebody else in the first circumstance." Therefore, it concluded that the probative value of this evidence outweighed its prejudicial effect.

The felony weapons possession charge is clearly one that is punishable by imprisonment over one year, and less than ten years has elapsed between the Defendant's release from confinement on this conviction and the commencement of this prosecution. Therefore, at issue, are whether he was given reasonable pretrial notice and whether the probative value of this conviction outweighs its prejudicial effect.

As previously stated, the State must give the accused reasonable written notice of the impeaching conviction before trial. This means that the State must notify the defendant in writing that it intends to use a prior conviction to impeach the defendant at trial. State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). This Court has previously held that the State did not comply with the written notice requirement when it sent a discovery response to defense counsel that outlined the defendant's criminal record but failed to inform the defendant of its intention to use the prior conviction for impeachment. State v. Barnard, 899 S.W.2d 617, 622 (Tenn. Crim. App. 1994). However, the Barnard Court found that the defendant was not unduly prejudiced, and the error was harmless.

In the case under submission, we conclude that the Defendant received adequate notice because the State informed him of its intention to impeach him with his prior convictions prior to trial, even though it was the morning of the trial. The Defendant could have requested a continuance

based upon this new information, but he did not. Further, we conclude that even if the State's notification was not reasonable due to its lateness, any error is harmless. The State told the trial court, and the Defendant agreed, that he received his NCIC report as part of discovery. Therefore, he was on notice of this previous conviction, even if he was unaware of the State's intention to impeach him with the conviction. In accordance with Barnard, the Defendant has failed to prove prejudice. We therefore turn to decide whether the fourth and final requirement of Rule 609 was met.

With regard to the fourth and final requirement, that the probative value of the conviction outweighs its prejudicial effect, the Tennessee Supreme Court rejected a per se rule that permits impeachment with any felony conviction. See Mixon, 983 S.W.2d at 674. Further, it has concluded that the offenses of possession of a controlled substance or sale of a controlled substance do not comport with the plain meaning of "dishonesty," stating, "The statutory elements of these offenses do not require that the controlled substance be sold or possessed in a manner that involves deceit or fraud." Waller, 118 S.W.3d at 372. Therefore, it concluded that the defendant's prior drug convictions used in Waller were, "at best," only slightly probative of the defendant's credibility. Id. at 373. Having so decided, the Waller Court stated:

> Once the trial court finds that the impeaching conviction has some relevance to the issue of the defendant's credibility, it should next "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." When an impeaching conviction is substantially similar to the charged offense, a danger exists that jurors will improperly consider the impeaching conviction as evidence of the propensity of the defendant to commit the crime. Accordingly, the unfair prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the conviction is substantially similar to the charged offense. However, evidence of a prior conviction that is substantially similar to the charged offense is not per se inadmissible for impeachment purposes. Under these circumstances, a trial court should carefully balance the impeaching conviction's relevance with regard to credibility against its unfair prejudicial effect on substantive issues.

Id. (citations omitted).

In the case under submission, using the Waller decision as a guide, we conclude that felony weapons possession is not an offense that requires that the weapon be possessed in a manner that involves deceit or fraud. Therefore, this prior weapons possession conviction is, "at best," only slightly probative of the Defendant's credibility.

Because we have concluded that there is some probative value we must turn to decide whether this probative value is outweighed by the prejudicial effect, and we must look at whether felony weapons possession is substantially similar to first degree murder and attempted first degree murder. When an impeaching conviction is substantially similar to the charged offense, a danger exists that jurors will improperly consider the impeaching conviction as evidence of the propensity

-23-

of the defendant to commit the crime. Mixon, 983 S.W.2d at 674. At first look, a felony weapons possession charge does not seem substantially similar to attempted first degree murder or first degree murder. However, even if substantially similar, that does not render the offense per se inadmissible for impeachment purposes if, after a careful balance, the impeaching conviction's relevance with regard to credibility outweighs its unfair prejudicial effect on substantive issues. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999); Mixon, 983 S.W.2d at 674.

In our determination of whether the probative value outweighs the prejudicial effect, we find helpful this Court's decision in State v. Jackie F. Curry, No. E2000-02475-CCA-R3-CD, 2001 WL 872789 (Tenn. Crim. App., at Knoxville, Aug. 2, 2001), *perm. app. denied* (Tenn. 2001). In that case, the defendant was tried and convicted of three counts of aggravated rape. Id. at *1. The victim testified that the Defendant pulled out a bag of cocaine, and, when the victim refused to snort it, he poured the cocaine into her mouth. Id. The defendant testified that the victim consented to have sexual relations with him, and he did not force her to take the cocaine. Id. at *3. The trial court, over the defendant's objection, allowed the State to impeach the defendant with his previous convictions for the sale of cocaine. Id. at *5. On appeal, this Court held:

> Here, the probative value of the sale of cocaine convictions on the issue of the [d]efendant's credibility was overwhelming, given the victim's contention that the Defendant poured cocaine down her mouth. Further, the conviction reflected the Defendant's inability to abide by the laws of this State. Moreover, because the convictions were for crimes substantially different than aggravated rape, we find that any resulting prejudice was minimal.

Id.

We find our holding in Curry persuasive to our analysis in the case under submission. At issue was whether the Defendant had a gun with him the day of this crime. The witnesses said that the Defendant went to his car, retrieved his gun, and then shot Burton and Sparks. The Defendant testified that he took Burton's gun and shot Burton and shot Sparks with Burton's gun. Therefore, the Defendant's previous convictions for felony weapons possession on the issue of his credibility is overwhelming. Accordingly we conclude that the probative value of this evidence outweighed any prejudicial effect.

Further, even if there were error, we must then decide whether the error in this case affirmatively or more probably than not affected the judgment to the Defendant's prejudice. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); Galmore, 994 S.W.2d at 122. The Defendant is not entitled to relief if he was not prejudiced by the error. State v. Taylor, 993 S.W.2d 33, 35 (Tenn. 1999). The Defendant's theory was that both eyewitnesses to the Pilot station robbery were mistaken when they identified him as the perpetrator in that criminal episode. The Defendant asserts that he shot and killed Burton and Sparks with Burton's gun while defending himself. The jury rejected these arguments, believing the eyewitnesses' identification of the Defendant as the Pilot station robber and concluding that the other evidence linking the Defendant to this crime, including his car

-24-

and the evidence found in his car, proved he committed the Pilot station robbery and shooting beyond a reasonable doubt.  In the face of this overwhelming and mostly uncontroverted evidence, and because the 1994 felony weapons possession was properly admitted, we conclude that the Defendant has failed to demonstrate that he was prejudiced by the trial court's ruling, even if such ruling, allowing the 1996 felony weapon conviction to be admitted for impeachment purposes, was erroneous.  We hold, therefore, that even if the trial court erred in ruling that the Defendant's prior 1996 felony weapons possession conviction was admissible for impeachment purposes, such error was harmless.

### 2.  Sparks' Arrest for Aggravated Robbery

The Defendant next contends that the trial court abused its discretion when it refused to allow him to cross-examine Sparks about Sparks' arrest for the aggravated robbery of a Texaco gas station.  The Defendant explains that Sparks used a gun in this robbery and was driving a blue Ford Bronco, which is similar to the Defendant's car.  The Defendant asserts that the trial court interfered with his right to present a defense because his theory was that Burton, who looks similar to the Defendant, committed the Pilot station robbery.  Further, the Defendant argues that the fact that Sparks, who lived with Burton, committed a similar robbery in a similar way and in a similar car was important to his theory of defense.  Therefore, he asserts that he should have been permitted to cross-examine Sparks about these facts.  The State first asserts that the Defendant waived this issue for failure to cite any authority, and then asserts that, even if not waived, the trial court did not abuse its discretion in this regard.

Prior to trial, the State moved to prohibit the Defendant's counsel from cross-examining Sparks about the facts and circumstances surrounding his arrest.  The State conceded that the Defendant could ask Sparks about the conviction as an attack on Sparks' credibility, but it requested that the Defendant be prohibited from questioning Sparks about the details of the conviction.  During the trial, the Defendant offered a proffer of evidence, calling Officer Frank Wolfe to testify.  The State objected, contending that any testimony offered by Officer Wolfe was irrelevant.  The trial court allowed the proffer, and Office Wolfe testified that on July 27, 2002, he participated in the robbery investigation of a Texaco Favorite Market, and the two suspects were driving a 1988 "bluish" Ford Bronco.  The officer said that Sparks was charged with aggravated robbery for that crime.  The trial court ruled that this evidence was irrelevant, finding that Sparks is a white male, this robbery occurred ten months after the incidents for which the Defendant was charged, and there was no proof that the Defendant drove a blue Bronco.  Accordingly, the trial court ruled that any probative value of this evidence was outweighed by the prejudicial effect, and, on that basis, it refused to allow the jury to hear this evidence.  The trial court also found that the evidence that the Defendant's counsel was attempting to introduce was prohibited by Tennessee Rules of Evidence 608 and 609.

Initially, we note that the Defendant has risked waiver of this issue by failing to reference or cite any authority to support his contention in his brief to this Court.  Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to

authorities, or appropriate references to the record will be treated as waived in this court." Accordingly, while the Defendant has risked waiver, we will nonetheless proceed to address the Defendant's claim on its merits.

As previously stated, Rule 609 of the Tennessee Rules of Evidence allows the credibility of a witness to be attacked by presenting evidence of prior convictions if certain conditions are met. Tenn. R. Evid. 609(a). A trial court's ruling under Rule 609 will not be reversed absent an abuse of discretion. Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979). A trial court abuses its discretion in this regard only when it "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" Shirley, 6 S.W.3d at 247 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). Pursuant to Rule 609, evidence of a witness's prior conviction must be "'limited to the fact of a former conviction and of what crime, with the object only of affecting the credibility of the witness . . . .'" State v. Taylor, 993 S.W.2d 33, 34 (Tenn. 1999) (citing State v. Morgan, 541 S.W.2d 385, 389 (Tenn. 1976)). "Thus, 'evidence' of a prior conviction admissible under Rule 609(a) is limited to the fact of a former conviction and the crime that was committed." Id. Accordingly, we conclude that the facts and circumstances surrounding Sparks' robbery conviction were not admissible pursuant to Rule 609, and we turn to decide whether the trial court abused its discretion when it determined that this evidence was not relevant and that any probative value it had was outweighed by its prejudice.

In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial court arbitrarily exercised its discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" See Forbes, 918 S.W.2d at 449 (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially

outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'[E]xcluding relevant evidence under [Tenn. R. Evid. 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

The Tennessee Supreme Court has held that Rule 404(b) does not bar evidence of crimes, wrongs, or acts by a person other than the defendant. State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002) (stating that 404(b) does not apply when a third party defense is at issue); State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997). Moreover, the Court has concluded that the admissibility of evidence that implicates a person other than the defendant for the crime is governed solely by the Rules of Evidence, not by a stricter standard. State v. Powers, 101 S.W.3d 383, 394-95 (Tenn. 2003). We view this to mean that, as far as relevance is concerned, evidence that has a tendency to make the fact of another perpetrator more probable than not would be admissible. See Tenn. R. Evid. 401. Obviously, the extent of its inconsistency with the defendant's guilt would bear on the probative value of such evidence, which would be important when a trial court weighs the probative value against the danger of prejudice or confusion in order to determine admissibility under Rule 403 of the Tennessee Rules of Evidence.

Therefore, we must determine whether the trial court abused its discretion when it determined that the evidence that Sparks committed a robbery was inadmissible because it was not relevant. The Defendant sought to question Sparks about the facts surrounding Sparks' robbery conviction to elicit the testimony that Sparks robbed a gas station using a gun and drove a blue Ford Bronco. He wanted to thereby attempt to show that Burton, who looked similar to the Defendant and lived with Sparks, could have used the same Ford Bronco to commit the Pilot station robbery. Essentially, the Defendant wanted through this testimony to create reasonable doubt that he committed the Pilot station robbery. We, however, cannot conclude that the trial court abused its discretion when it determined that evidence that Sparks committed a robbery in a Ford Bronco did not have a tendency to make the fact that Burton committed the Pilot station robbery more probable than not. Had the Defendant sought to prove that Sparks committed the Pilot station robbery this would be a closer call, but, as the facts are, the trial court did not err by finding that Sparks' robbery, which occurred some ten months after Burton's death, was not relevant to whether Burton committed the Pilot station robbery, so as to exculpate the Defendant. We conclude that the trial court did not err when it concluded that the evidence was not relevant. Further, even if relevant, the trial court did not abuse its discretion when it determined that any probative value that this evidence had was far outweighed by its prejudicial effect. The Defendant is not entitled to relief on this issue.

### 3. Testimony of Sparks' Probation Officer

The Defendant next asserts that the trial court abused its discretion when it refused to allow him to call Sparks' probation officer, Debbie Martin, who would have testified that Sparks lied on his probation application. The State again asserts that this issue is waived and, even if not waived, is without merit.

In a proffer of evidence at trial, the Defendant's counsel called Debbie Martin, an employee of the board of Probation and Parole, and she testified that she interviewed Sparks when he applied for probation. Martin said that Sparks was involved in a robbery and was seeking probation, and, as part of the application, he was instructed to list all charges of his criminal history. Martin testified that Sparks failed to disclose felony drug charges that were pending against him. She said that he had been arrested on these charges six days before her interview with him. On cross-examination, Martin testified that Sparks was given the form to fill out before he was arrested, and he said that he omitted the drug charges because the questionnaire asked for his past history. She said that he did not deny the charges when she confronted him about them. Sparks was denied probation. The trial court ruled that this information was not relevant.

Initially, we note that the Defendant has risked waiver by failing to reference or cite any authority to support his contention in his brief to this Court. Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Even though the Defendant has risked waiver, we will nonetheless proceed to address the Defendant's claims on their merits.

Pursuant to Rule 608 of the Tennessee Rules of Evidence, the credibility of a witness may be attacked by specific instances of conduct. Rule 608 states that these specific instances of conduct "may not be proved by extrinsic evidence." In this case, the evidence that the Defendant sought to admit was clearly extrinsic evidence about a specific instance of conduct meant to attack the Sparks' credibility. Because this evidence falls squarely under the evidence that Rule 608 makes inadmissible, we conclude that the trial court did not abuse its discretion when it refused to allow the Defendant to call Martin to testify.

### 4. Reynolds as a Rebuttal Witness

The Defendant next asserts that the trial court erred when it allowed the State to call Reynolds as a rebuttal witness. The Defendant asserts that Reynolds was not sequestered pursuant to Tennessee Rule of Evidence 615, and, therefore, he should not have been allowed to testify. The State counters that the Defendant's counsel did not object to Reynolds attending all of the trial except for the testimony of Wycoff. Therefore, the State asserts, he cannot now contend that the trial court abused its discretion by allowing Reynolds to be recalled. Further, the State contends that Rule 615 does not require exclusion of the victim, Reynolds, and therefore he properly testified on rebuttal.

Tennessee Rule of Evidence 615 states the following:

Exclusion of witnesses.--At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person

whose presence is shown by a party to be essential to the presentation of the party's cause.

The Tennessee Supreme Court addressed whether the trial court erred when it allowed a victim to testify at a sentencing hearing even though she had remained in the courtroom after the defense invoked the rule of sequestration. The Court stated:

[W]e note that Rule 615 does not mandate exclusion of all persons and permits counsel for a party that is not a natural person to designate a person to remain in the courtroom. The 1997 Advisory Commission Comments to Rule 615 specifically explain that this provision permits the prosecuting attorney for the State of Tennessee to designate a crime victim as the person to remain in the courtroom despite invocation of the rule of sequestration.

State v. Elkins, 83 S.W.3d 706, 713 (Tenn. 2002). The Court went on to say that the State could designate the victim as a person to remain in the courtroom, implying that she could again testify at both the trial and the sentencing hearing. Id.

In the case under submission, the State did not have the opportunity to designate Reynolds as a person to remain in the courtroom because the Defendant's counsel agreed to allow Reynolds to remain in the courtroom. Therefore, we conclude that the Defendant cannot now complain that Reynolds being called as a rebuttal witnesses violated the Defendant's right to have witnesses sequestered. Further, on rebuttal, Reynolds examined a picture of Burton and stated that he was certain that Burton did not commit the robbery, and he stated that he had heard the Defendant's voice while the Defendant was testifying and recognized it as belonging to the man who robbed him. The victim's testimony that Burton was not the man who committed these crimes was only made relevant when the Defendant presented his theory that he took Burton's gun and that it must have, therefore, been Burton who robbed the Pilot station. Accordingly, we conclude that the trial court did not abuse its discretion when it allowed the State to call Reynolds as a rebuttal witness. Further, even if we were to conclude otherwise, any error was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### 5. "Early" Jencks Material

The Defendant asserts that the trial court abused its discretion when it denied the Defendant's motion in limine that requested that the Defendant be given "early" Jencks material. Further, the Defendant contends that the trial court should have instructed the jury about when the State has to produce Jencks material. The Defendant concedes that Tennessee Rule of Criminal Procedure 26.2 mandates that the State does not have to produce a witness's statement until after he or she testifies. He then asks this Court "not to change rule 26.2, but to provide trial courts with language which may give substance to the lofty but empty words encouraging early Jencks." We conclude that this rule comports with both State and Federal law, and we, therefore, hold that the Defendant is not entitled to relief on this issue. Further, we conclude that the trial court did not abuse its discretion when it

refused to provide an instruction to the jury about when the State was required to provide <u>Jencks</u> material. The trial court chose, as was within its province, to provide the Defendant's counsel breaks to review the <u>Jencks</u> material. Accordingly, the Defendant is not entitled to relief on this issue.

### 6. Cross-Examination of Lieutenant Lee

The Defendant next asserts that the trial court erred when it ruled that the Defendant's counsel improperly cross-examined Lieutenant Lee. The Defendant sought to cross-examine Lee about why he had not investigated the registration number on the gun that was found in the Defendant's possession. The officer admitted that he did not know whether the registration number had been investigated. The trial court permitted this questioning, but, out of the presence of the jury, informed the Defendant's counsel that he should go no farther in this line of questioning, and the State told the Defendant's counsel it would call someone to testify who had that information.

The Defendant again has risked waiver by failing to reference or cite any authority to support his contention in his brief to this Court. Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Accordingly, the Defendant has waived his claim for relief by failing to provide any citations to any authority. Further, he has provided no evidence that he was prejudiced. He elicited the testimony that he sought from the officer, and, while he was admonished by the trial court, it was outside the presence of the jury. Further, a witness later testified that the gun's registration number was run, and the witness testified about the name of the registered owner. Under these circumstances, we cannot conclude that the Defendant met his burden of showing that the trial court abused its discretion or that he showed he was, in any way, prejudiced.

### C. Sentencing

The Defendant next asserts that the trial court erred when sentencing him. First, he asserts that the trial court improperly ordered that his sentences run consecutively based upon the finding that he was a dangerous offender and had an extensive criminal history. Second, he asserts that the trial court improperly applied enhancement factors in violation of <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). The State counters that the trial court properly imposed consecutive sentences and that <u>Blakely</u> does not apply to Tennessee's sentencing scheme according to <u>State v. Gomez</u>, 163 S.W.3d 632 (Tenn. 2005).

When the trial court sentenced the Defendant, it found, in pertinent part:

> Now, as to 40-35-115, I think that the criteria involved the following things. That the [D]efendant is an offender whose record of criminal activity is extensive. That does not necessarily mean criminal convictions, but certain criminal activity. Whether or not the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation. And whether or not these

sentences involve danger to the community or the need to protect the community from danger. . . .

The Court finds that under all circumstances, th[ose are] the enhance[ment] factors that have been set out and discussed, that there are no mitigating factors in this situation. And that in fact [the Defendant] is indeed a dangerous offender whose criminal activity is significant. His past history is significant. He had no hesitation in these events. He had no regard for the risk to human life. That society is obligated to protect themselves.

When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We note that the defendant bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; Ashby, 823 S.W.2d at 169.

### 1. Consecutive Sentences

Pursuant to Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of

more than one criminal offense, the court shall order the sentences to run either consecutively or concurrently. The trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b)(1)-(7). Tennessee Code Annotated section 40-35-115(b) provides that a trial court may find that consecutive sentencing is proper where:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . . [or]
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Tenn. Code Ann. § 40-35-115(b)(2) & (4). We conclude, as did the trial court, that the record supports the applicability of both the aforementioned factors for consecutive sentences. Accordingly, the trial court did not abuse its discretion by ordering that the Defendant's sentences run consecutively. This issue is without merit.

## 2. **Blakely v. Washington**

The Defendant contends that his sentence should be reduced to the statutory minimum because the enhancement factors must be either admitted by the Defendant or found by a jury determination beyond a reasonable doubt in light of Blakely v. Washington, 542 U.S. 296 (2004). Recently, the Tennessee Supreme Court concluded that Blakely does not apply to Tennessee's sentencing scheme because "the Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure which violates the Sixth Amendment right to jury trial." State v. Gomez, 163 S.W.3d 632, 651 (Tenn. 2005). Thus, Blakely v. Washington does not bar the trial court from enhancing the Defendant's sentence pursuant to Tennessee Code Annotated section 40-35-114, and the Defendant is not entitled to relief on this issue.

## III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE

-32-